Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Argued November 24, 2003       Decided January 30, 2004

No. 02-1267

COMMUNITIES AGAINST RUNWAY EXPANSION, INC., ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

MASSACHUSETTS PORT AUTHORITY AND
CITY OF BOSTON,
INTERVENORS

---

On Petition for Review of an Order of the
Federal Aviation Administration

---

*Peter L. Koff* argued the cause and filed the briefs for petitioners.

*Stephen M. Leonard* argued the cause and filed the briefs for intervenor City of Boston in support of petitioner.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Todd S. Aagaard*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Ellen J. Durkee* and *Lisa E. Jones*, Attorneys. *Andrew C. Mergen* and *Mary A. Thurston*, Attorneys, entered appearances.

*Roscoe Trimmier, Jr.* argued the cause for intervenor Massachusetts Port Authority in support of respondent. With him on the brief were *Richard J. Lettieri*, *John P. Bueker*, *Mark W. Pearlstein* and *Steven W. Kasten*.

Before: GINSBURG, *Chief Judge*, and EDWARDS and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: This case involves a final order of the Federal Aviation Administration ("FAA") approving changes to the layout plan for Boston's Logan International Airport (including the construction of a new runway and improvement of existing taxiways) and making certain determinations necessary for the project to be eligible for federal funding under the Airport and Airway Improvement Act, 49 U.S.C. §§ 47101 *et seq.* ("AAIA"). The order was based, in part, on an environmental impact statement ("EIS") prepared pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4347 ("NEPA").

Petitioners Communities Against Runway Expansion and several trustees of the South Shore Jet Pollution Council Charitable Trust (collectively "CARE") seek review of the FAA order and the EIS. CARE claims that the order violates NEPA and is arbitrary and capricious, because the FAA did not properly select and supervise the contractor who prepared the EIS and failed to make public certain information relevant to the environmental review. CARE further asserts that the order violates the AAIA by failing to certify that the communities in which the project is located were notified of their right to petition the Secretary of Transportation. Finally, CARE contends that the order improperly certifies for AAIA purposes that the project is consistent with local plans and that fair consideration was given to local

interests. Intervenor City of Boston claims, in addition, that the "environmental justice" analysis included in the EIS was based on an unreasonable methodology and should be set aside as arbitrary and capricious.

Even assuming that the FAA erred in selecting the EIS contractor, we find no grounds for relief. There is no indication that this putative error compromised the objectivity and integrity of the NEPA review process. CARE's and Boston's remaining claims are meritless. We therefore deny the petition for review.

## I. BACKGROUND

### A. Statutory Context

The AAIA authorizes the FAA to provide federal funding for airport improvement projects and establishes detailed requirements that must be satisfied in order for a project to be eligible for such funding. *See* 49 U.S.C. §§ 47104-47107 (2000). Airports that seek AAIA funding or have received such funding in the past must, *inter alia*, maintain a current FAA-approved airport layout plan. 49 U.S.C. § 47107(a)(16).

Where FAA approval of funding for an airport improvement project constitutes a "major Federal action[ ] significantly affecting the quality of the human environment" for purposes of NEPA, the FAA must prepare an EIS analyzing the proposed project's environmental consequences and evaluating reasonable alternatives. *See* 42 U.S.C. § 4332(C) (2000); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348-51 (1989) (explaining NEPA process pursuant to which federal agencies must evaluate environmental effects). The FAA's review under NEPA is governed in part by guidelines promulgated by the Council on Environmental Quality ("CEQ"), which are binding on federal agencies. *See Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 884 n.6 (D.C. Cir. 1987). The project at issue in the instant case is also subject to the Massachusetts Environmental Policy Act ("MEPA"), a state-law analog of NEPA that requires Massachusetts state agencies sponsoring qualifying projects to pre-

pare an environmental impact report ("EIR"). *See* MASS. GEN. LAWS ch. 30, §§ 62A, 62B.

## B. Factual Background

Logan International Airport is owned and operated by the Massachusetts Port Authority ("Massport"), a Massachusetts state agency for MEPA purposes. The airport is located near the center of downtown Boston and is surrounded on three sides by densely populated residential neighborhoods. Logan is one of the Nation's busiest airports, ranking 18th in volume of passenger traffic and 11th in number of aircraft operations during the year 2000. It is also one of the most delay-prone: In 2000, Logan was the sixth worst airport in the country in arrival and departure delays, and it was second worst in arrival delays.

In 1993, Massport and the FAA began to study options for addressing flight delays at Logan Airport. Various options were considered, including the construction of a new east-west runway designated "Runway 14/32," construction of a new "Centerfield Taxiway," and improvement of several existing taxiways. In 1995, the FAA and Massport initiated the environmental review process required under federal and state laws to assess the impacts of different options. Because the FAA's obligations under NEPA were similar to those of Massport under MEPA, the two agencies agreed to prepare a joint EIS/EIR. *See* 40 C.F.R. § 1506.2(c) (2003) (authorizing joint federal-state environmental review). In July of 1996, Massport contracted with the consulting firm of Simat, Helliesen & Eichner, Inc. ("SH&E") to prepare the EIS/EIR.

In February 1999, the FAA and Massport issued a draft EIS/EIR for public review and comment. In response to public concerns, the FAA opted to prepare a Supplemental Draft EIS ("SDEIS") to address certain issues, and the FAA and Massport jointly published the SDEIS/Final EIR in March 2001. The SDEIS grouped the options under consideration into five alternatives, including a "No Action" alternative, and endorsed the "Preferred Alternative," which called for construction of Runway 14/32 and the Centerfield Taxiway, as well as improvements to certain existing taxiways.

*See* Final Envt'l Impact Statement, Logan Airside Improvements Planning Project, Boston Logan Int'l Airport (June 2002) ("FEIS"), at 1-31, *reprinted in* Joint Appendix ("J.A.") 672.

As part of its review of the SDEIS, the FAA contracted with the MITRE Corporation's Center for Advanced Aviation System Development ("MITRE") to conduct an independent analysis of predicted runway utilization and capacity and delay modeling in the SDEIS. MITRE's final report generally confirmed the reasonableness of the SDEIS's assumptions and predictions, but concluded that the predicted delay savings attributable to Runway 14/32 were overstated. However, MITRE concluded that "the savings are still substantial under almost any reasonable long term traffic forecast." FEIS Appendix J at 4, J.A. 1110.

In June of 2002, the FAA issued the Final EIS for the project. The FEIS summarized and incorporated information from the SDEIS and endorsed the Preferred Alternative. *See* FEIS at 1-32, J.A. 673. Taking account of the MITRE report, the FEIS concluded that construction of Runway 14/32 would reduce predicted future delays by 21% to 28% in comparison with the No Action alternative. *Id.* at 1-38 - 1-42, J.A. 679-83. The FEIS predicted that the Preferred Alternative would reduce the number of people exposed to the highest levels of noise relative to the No Action alternative, but would slightly increase the number of people exposed to significant noise levels under one potential scenario. Noise impacts would be more evenly distributed among surrounding neighborhoods and nighttime noise would be reduced. *Id.* at 2-13 - 2-19, J.A. 696-700. The FEIS also included an "environmental justice" analysis, which concluded that any increase in significant noise exposure would not be disproportionately borne by low-income or minority populations. *Id.* at 3-66, J.A. 791.

On August 2, 2002, the FAA issued a final order in the form of a Record of Decision for the Logan Airside Improvements Planning Project. Record of Decision, Airside Improvements Planning Project, Logan Int'l Airport, Boston,

Mass. (Aug. 2, 2002) ("ROD"), *reprinted in* J.A. 1419-98. The Record of Decision reviewed the conclusions of the EIS and approved a revised airport layout plan for Logan, including Runway 14/32 and improvements to existing taxiways. ROD at 1, J.A. 1420. In addition, the Record of Decision included several determinations necessary for the project to be eligible for federal funding under the AAIA. The FAA determined in relevant part that the project was reasonably consistent with local land-use plans, as required under 49 U.S.C. § 47106(a)(1), and that fair consideration had been given to the interests of local communities, as required under 49 U.S.C. § 47106(b)(2). ROD at 29, J.A. 1448. CARE filed a timely petition for review in this court. Boston subsequently intervened in support of CARE, and Massport intervened in support of the FAA.

## II. ANALYSIS

### A. Jurisdictional Issues

#### 1. *Subject Matter Jurisdiction*

CARE's petition for review seeks to invoke the court's jurisdiction under 49 U.S.C. § 46110(a). Section 46110(a) states, in relevant part, that "a person disclosing a substantial interest in an order issued by the . . . Administrator of the Federal Aviation Administration with respect to aviation safety duties and powers designated to be carried out by the Administrator[ ] under [Part A of Subtitle VII]," may petition this court for direct review of the order. 49 U.S.C. § 46110(a) (2000). None of the parties doubts that the court has subject matter jurisdiction under § 46110(a) to address the claims raised by CARE. Nonetheless, in light of the recent decisions of the Second and Ninth Circuits construing 49 U.S.C. § 46110(a), *see Comm. to Stop Airport Expansion v. FAA*, 320 F.3d 285 (2d Cir. 2003) (finding no jurisdiction to review directly an FAA order approving an airport layout plan); *City of Alameda v. FAA*, 285 F.3d 1143 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 1899 (2003) (same), the parties were instructed to brief the issue. Having reviewed the applicable

case law and the parties' arguments, we agree that subject matter jurisdiction exists in this court.

The FAA order at issue here was promulgated pursuant to Parts A and B of Subtitle VII, which relate to "Air Commerce and Safety" and "Airport Development and Noise," respectively. ROD at 31, J.A. 1450. Petitioners' *claims* concededly are concerned in part with "airport development" and "noise" (matters covered by Part B), but this does not defeat jurisdiction in this court. Rather, the important fact here is that the FAA's order rests on *both* Parts A and B. *See Comm. to Stop Airport Expansion v. FAA*, 320 F.3d at 290 ("[T]here may be FAA orders that involve the exercise of authority deriving from both Parts A and B, and [we] note that we would have jurisdiction to review such an order."); *Suburban O'Hare Comm'n v. Dole*, 787 F.2d 186, 192-93 (7th Cir.), *cert. denied*, 479 U.S. 847 (1986) ("When an agency decision has two distinct bases, one of which provides for exclusive jurisdiction in the courts of appeals, the entire decision is reviewable exclusively in the appellate court."); *Gen. Elec. Uranium Mgmt. Corp. v. United States Dep't of Energy*, 764 F.2d 896, 903 (D.C. Cir. 1985) ("[I]n administrative appeals, 'where it is unclear whether jurisdiction is in the district court or the court of appeals the ambiguity is resolved in favor of the latter.'" (footnote and citation omitted)); *City of Rochester v. Bond*, 603 F.2d 927, 937 (D.C. Cir. 1979) (noting "the irrelevance of the specific substantive ground" on which an FAA order is challenged for purposes of determining jurisdiction under the judicial review provision). Because the disputed order in this case clearly implicates and was *issued* in part pursuant to Part A, jurisdiction is proper in this court under § 46110(a).

### 2. *Standing*

In order for an association to have representational standing under Article III of the Constitution, at least one of its members must have standing to bring the petition in his or her own right, the interests the association seeks to protect must be germane to its purpose, and the claim asserted and the relief sought must not require the individual member or

members to participate directly in the suit. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Massport argues that CARE does not satisfy the first of these requirements. To do so, CARE must demonstrate that at least one of its members "(1) ... has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

Under *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002), a petitioner whose standing is not self-evident is required to demonstrate entitlement to review by means of record or supplemental evidence "at the first appropriate point in the review proceeding." *Id.* at 900. CARE's initial submissions in support of standing – the declarations of two members living near Logan Airport – did not allege facts sufficient to support a finding that the declarants would be exposed to a concrete and particularized "injury in fact" as a result of the contested project. *See City of Olmstead Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002) ("[G]eographic proximity does not, in and of itself, confer standing on any entity under NEPA or any other statute."). In response to Massport's challenge to the adequacy of its submissions, CARE submitted supplemental declarations of two other members with its reply brief. These supplemental declarations clearly demonstrate that there is a substantial probability that the declarants will be subjected to increased noise from aircraft operations at Logan as a result of the project.

The Declaration of Roberta Horn, a CARE member and a resident of East Boston, cites the FEIS's prediction that the block on which she lives will be exposed to increased noise as a result of the project under the "29 million-passenger low fleet" scenario. Horn Decl. ¶¶ 5-6 (citing FEIS at 2-8 (Fig. 2.1-2), J.A. 692), *reprinted in* Petitioners' Reply Br. Add. 1 at 2-3. The Declaration of Libby Arsenault, a CARE member and resident of the Eagle Hill neighborhood of East Boston,

cites the FEIS's prediction that her neighborhood will be exposed to increased noise due to the project under the "37.5 million-passenger high regional jet fleet" scenario. Arsenault Decl. at ¶¶ 5-7 (citing FEIS 3-120 (Fig. 3.8-17), J.A. 838), *reprinted in* Petitioners' Reply Br. Add. 2 at 2-4. These Declarations, if otherwise admissible, confirm CARE's standing.

There is a question, however, as to whether the Declarations are timely, because they were not submitted until CARE filed its reply brief. While we generally require a petitioner whose standing is not self-evident to provide adequate factual support for its standing in its opening brief, *Sierra Club*, 292 F.3d at 900, we hold here that CARE's belated submission may be excused in this case. The supplemental declarations make it patently obvious that, based on information in the FEIS, at least one of CARE's members will suffer a cognizable "injury in fact" as a result of the disputed order. Because this conclusion is irrefutable, Massport was not prejudiced by its inability to respond to the supplemental declarations. *See id.* at 901 ("[A]ll too often the petitioner does not submit evidence [supporting its standing] with its opening brief and the respondent is therefore left to flail at the unknown in an attempt to prove the negative . . . .").

The anticipated injuries to CARE's members are fairly traceable to the FAA's order approving the project, and these injuries would be redressed by a decision setting aside that order. We therefore conclude that CARE has standing to challenge the FAA order and the supporting EIS. We hasten to add that future petitioners will be well-advised to adhere carefully to the requirements of *Sierra Club*, as it will not always be possible to cure a defective initial submission so conclusively.

## B.  Standard of Review

In reviewing the FAA's compliance with NEPA, our role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *City of*

*Olmstead Falls*, 292 F.3d at 269 (quoting *Baltimore Gas & Elec. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983)). We review the EIS to "ensure that the agency took a 'hard look' at the environmental consequences of its decision to go forward with the project," *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502,1503-04 (D.C. Cir.), *cert. denied*, 513 U.S. 1043 (1994), but in so doing we are mindful that "it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process," *Robertson*, 490 U.S. at 350.

We review both the Record of Decision and the EIS under the Administrative Procedure Act ("APA") to determine whether the FAA's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000).

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including "a rational connection between the facts found and the decision made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citations omitted).

## C. Selection and Supervision of the EIS Contractor

CEQ's NEPA guidelines permit an EIS to be prepared by a contractor if (1) the lead federal agency, or the lead agency "in cooperation with cooperating agencies," selects the contractor; (2) the contractor executes a disclosure statement specifying that it has "no financial or other interest in the outcome of the project"; and (3) the responsible federal officials furnish guidance and participate in the preparation of the EIS, evaluate the EIS prior to its approval, and take

responsibility for its scope and contents. 40 C.F.R. § 1506.5(c) (2003); *see also* 40 C.F.R. § 1501.6 (2003) (defining a "cooperating agency" as a qualified federal agency). In addition, the FAA has issued an internal third-party contracting guidance addressing the preparation of an EIS by a contractor selected by the FAA and engaged by an airport sponsor. *See* EIS Preparation Guidance – Third Party Contracting (July 24, 1995), http://www1.faa.gov/arp/app600/5054a/3rdpty.htm.

CARE asserts that the FAA violated the CEQ regulation and the third-party contracting guidance by failing properly to select SH&E as the contractor, allowing SH&E to be selected despite a potential conflict of interest, and abdicating its responsibility to oversee the preparation of the EIS. Contrary to the FAA's assertion, petitioners did not waive these claims by failing to raise them during the EIS process. Under 49 U.S.C. § 46110(d), we may consider objections not raised during the administrative proceeding if there was a "reasonable ground" for the omission. CARE plausibly asserts that it had no reason during the EIS process to suspect the alleged defects in the selection and supervision of SH&E, and we agree that this excuses CARE's failure to raise the claims below. This is no great help to CARE, however, as we hold that its claims either lack merit or do not entitle it to relief.

There is no evidence showing that the FAA itself selected SH&E as the contractor for the EIS, nor, on the other hand, is there any conclusive evidence that the FAA failed to do so. In December 1993, the FAA selected Cortell Associates to be the prime contractor for the EIS, and SH&E later became a member of the "consultant team" for the initial feasibility study. FAA official John Silva's notes from an October 1996 meeting indicate that Massport official Betty Desrosiers "announced SH&E as the new prime contractor." J.A. 56. SH&E certified in its disclosure statement that it was selected "on the basis of a competitive selection process," but the statement gives no indication as to who made the selection. J.A. 59.

We need not determine the FAA's precise role in SH&E's selection, however, because even assuming that the FAA did not properly discharge its obligations, petitioners would not be entitled to relief. We find, as in *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir.), *cert. denied*, 502 U.S. 994 (1991), that there is no cause to invalidate the EIS, because any error in the selection of the contractor "did not compromise the 'objectivity and integrity of the [NEPA] process.'" *Id.* at 202 (quoting Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981)). CARE has not alleged any substantive flaws in the FEIS itself, such as a failure to discuss significant impacts or to consider reasonable alternatives, and there is no indication in the record before us that the manner in which SH&E was chosen prejudiced the FAA's review of the project.

As required under 40 C.F.R. § 1506.5(c), SH&E executed a disclosure statement specifying that it had no financial or other interest in the outcome of the project. The statement certified that Massport had engaged SH&E for four other clearly identified projects, but that this would not influence SH&E's ability to participate objectively in the preparation of the EIS. J.A. 59. CARE has identified no conflict of interest that would disqualify SH&E from preparing the EIS, nor is any evident in the record before us.

CARE's claims that the FAA abdicated its responsibility to oversee the preparation of the EIS, and that SH&E improperly acted as an advocate for Massport in the environmental review process, likewise lack merit. The record confirms that the FAA consistently exercised control over the scope, content, and development of the EIS. Contrary to CARE's assertions, there was nothing improper in Massport's participation in joint meetings and its review of and comment on draft documents during the EIS process. As a cooperating state agency in a joint federal-state environmental review, Massport had a significant official role to play in jointly overseeing the preparation of the EIS. *See* 40 C.F.R. § 1506.2(c) (requiring federal agencies to "cooperate with State and local agencies to the fullest extent possible" includ-

ing in the preparation of joint environmental impact statements). As proprietor and operator of Logan, moreover, Massport was in a unique position to provide valuable information about the project; its exclusion from the environmental review process would have been counterproductive, to say the least.

### D. Disclosure of EIS-Related Information

One of the principal purposes of NEPA is to ensure public disclosure of information relevant to federal decisions significantly affecting the environment. *See Robertson*, 490 U.S. at 349; 40 C.F.R. § 1502.1 (2003). CARE claims that the FAA violated this central objective of the statute and acted arbitrarily and capriciously by failing to make public (1) information regarding the status and nature of federal funding approvals being sought by Massport from the FAA; (2) the cost-benefit methodology that an applicant for federal funding must use to quantify the delay savings benefits of proposed airport improvements; and (3) MITRE's draft work product, which allegedly contained strong criticisms of the EIS's delay savings predictions. We find no merit in these claims.

Massport had made no funding requests at the time the FAA completed the FEIS and issued its Record of Decision, so there was no information to be disclosed in this regard. In any case, the manner in which the project is funded has no bearing on its environmental impacts. As to the second claim, it is undisputed that the FAA was not required to undertake a formal cost-benefit analysis as part of the EIS. *See Suburban O'Hare Comm'n*, 787 F.2d at 191 n.8. CARE correctly notes that the FAA requires a cost-benefit analysis in order to approve a grant from its "discretionary fund" under the AAIA and prescribes a methodology for calculating the benefits of delay reductions. *See* 49 U.S.C. § 47115(d)(2); Federal Aviation Administration Policy and Final Guidance Regarding Benefit Cost Analysis (BCA) on Airport Capacity Projects for FAA Decisions on Airport Improvement Program (AIP) Discretionary Grants and Letters of Intent (LOI), 64 Fed. Reg. 70,107 (Dec. 15, 1999). But this has no bearing on the FAA's environmental review under NEPA,

and there is no merit to the suggestion that the FAA had an obligation to disclose the methodology in question as part of that review.

We likewise reject CARE's claim that the FAA was obligated to disclose MITRE's draft work product. As an initial matter, CARE cites no provision of NEPA or its implementing regulations, the APA, or any FAA regulation requiring the disclosure of an EIS contractor's draft work product. In any case, there is nothing in the record before us to suggest that MITRE's preliminary analysis fatally undermined the FAA's conclusions as to the benefits of the project, or that the FAA improperly sought to influence or suppress MITRE's conclusions. The FEIS included MITRE's final analysis of the technical questions it was asked to review. MITRE determined, in relevant part, that the SDEIS's predictions regarding delay savings were overstated, but that, "nevertheless, the savings are still substantial under almost any reasonable long term traffic forecast." FEIS Appendix J at 4, J.A. 1110. Both the FEIS and the Record of Decision took account of MITRE's conclusions in this regard. *See* FEIS at 3-69 - 3-71, J.A. 794-96; ROD at 12, J.A. 1431. There is no evidence that the differences between MITRE's draft work product – some of which ultimately was released pursuant to CARE's request under the Freedom of Information Act, 5 U.S.C. § 552 – and its final report reflect anything other than the development of MITRE's thinking in response to feedback from parties with relevant information, including the FAA, Massport, and SH&E.

### E. Environmental Justice Review

As noted above, the FAA included in the FEIS an "environmental justice" analysis, intended to evaluate whether the project would have disproportionately high and adverse human health or environmental effects on low-income or minority populations. In order to assess the project's impact on minority populations, the FEIS compared the demographics of the area expected to be exposed to significant noise impacts (the "actually affected area") with the demographics of the "potentially affected area." The potentially affected area

was defined as the whole of the cities and towns in which the actually affected area is located, encompassing all of Suffolk County. FEIS at 3-49, J.A. 776. The FEIS concluded that significant noise impacts from the project would not fall disproportionately on minorities. Minorities constitute 34% of the population expected to be exposed to significant noise impacts as a result of the project, whereas they constitute 48% of the population of the potentially affected area. *Id.* at 3-66, J.A. 791. In addition, minorities would constitute 34% of the population exposed to significant airport noise under either the Preferred Alternative or the No Action alternative. *Id.* at 3-58, J.A. 784.

Boston claims that the FAA's environmental justice analysis is arbitrary and capricious, because its choice of the "comparison population" – *i.e.*, the population of the "potentially affected area" – is unreasonable. Boston argues that using Suffolk County as the basis for comparison improperly biased the analysis, and that the FAA should instead have used the greater Boston metropolitan area – Logan's "core service area." Massport responds that Boston is precluded from raising this claim because the FAA's environmental justice analysis was undertaken pursuant to Executive Order 12,898 and a 1997 Department of Transportation order, both of which expressly state that they do not create a private right to judicial review. *See* Exec. Order No. 12,898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7,629, 7,632-33 (Feb. 11, 1994) (§ 6-609); Department of Transportation (DOT) Order To Address Minority Populations and Low-Income Populations, 62 Fed. Reg. 18,377, 18,379 (Apr. 15, 1997).

We conclude, in agreement with the FAA, that Boston's claim is properly before this court because it arises under NEPA and the APA, rather than the two orders cited above. The FAA exercised its discretion to include the environmental justice analysis in its NEPA evaluation, and that analysis therefore is properly subject to "arbitrary and capricious" review under the APA. *See City of Olmstead Falls*, 292 F.3d at 269 (holding that the "arbitrary and capricious" standard is

applied to determine the adequacy of an EIS). Boston's claim, in any event, clearly fails on the merits. The FAA's methodology was reasonable and adequately explained: The FEIS sought to compare the demographics of the population predicted to be affected by any increased noise resulting from the project to the demographics of the population that otherwise might conceivably be affected by noise from the airport. A comparison population based on a larger geographic area could reasonably be rejected because significant noise impacts are limited to the vicinity of the airport. The FAA's choice among reasonable analytical methodologies is entitled to deference from this court. *See Citizens Against Burlington*, 938 F.2d at 200-01 ("We have … held consistently that the rule of reason guides every aspect of the FAA's approach, including its choice of scientific method."). In any case, the FAA reasonably concluded that the minority proportion of the population exposed to significant noise impacts as a result of the project would be no greater than if no action were taken. FEIS at 3-58, J.A. 784.

**F. AAIA-Related Claims**

In order for the FAA to approve funding for the project under the AAIA, Massport must certify to the Secretary of Transportation that the communities in which the project is located have been advised that they have the right to petition the Secretary about the project. *See* 49 U.S.C. § 47106(c)(1)(A)(ii). CARE's claim that the FAA violated this requirement by failing to include this certification as part of the Record of Decision is not yet ripe for review. The Record of Decision did not approve funding or determine the project's eligibility for funding, and the FAA consequently had no obligation to include the certification.

The Record of Decision does include several other determinations necessary in order for the project to be eligible for AAIA funding, including that the project is "reasonably consistent with existing plans of public agencies for the development of the area," as required under 49 U.S.C. § 47106(a)(1), and that "[f]air consideration has been given to the interest of communities in or near the project location," as required

under 49 U.S.C. § 47106(b)(2). ROD at 29, J.A. 1448. CARE claims that these determinations were arbitrary and capricious. While the effects of the determinations will be manifest only if and when federal funding for the project is approved, the determinations are final and all parties agree that CARE's challenge to them is ripe for review. CARE's claims "present[ ] a concrete legal dispute; no further factual development is essential to clarify the issues . . . [and] nothing would be gained by postponing [their] resolution." *Payne Enters., Inc. v. United States*, 837 F.2d 486, 492 (D.C. Cir. 1988). We resolve these claims without hesitation in favor of the FAA.

CARE argues that the FAA's plan-consistency determination was arbitrary and capricious because the FEIS considered only the project's consistency with zoning requirements in East Boston and failed adequately to address Boston's comments during the EIS process that increased noise might negatively affect developments planned for South Boston and East Boston. The FAA responded to these comments by explaining that the project would not significantly alter overall patterns of runway use at Logan, J.A. 1283-84, and concluded that the project will in fact reduce noise impacts on most of the area near the airport, including South Boston and East Boston, *see* FEIS at 3-101 - 3-104, 3-113, J.A. 822-25, 832. We find, on this basis, that the FAA's determination is adequately supported by the record and satisfies the requirements of the AAIA. *See Town of Stratford v. FAA*, 285 F.3d 84, 90 (D.C. Cir. 2002) (finding that local permitting requirements would be sufficient to meet the AAIA's requirement that the project be "reasonably consistent" with local plans).

Finally, the extensive participation of local communities in the environmental review process, which is documented in the FEIS, *see* FEIS at 5-2, J.A. 908, amply supports the FAA's determination that fair consideration was given to local interests. *See Town of Stratford*, 285 F.3d at 90 (finding that the town's extensive involvement in the decision making process satisfied the "fair consideration" requirement).

### **III.** Conclusion

For the reasons set forth above, we deny the petition for review.