# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 7, 2007      Decided December 11, 2007

No. 06-1301

NUCLEAR INFORMATION AND RESOURCE SERVICE AND
PUBLIC CITIZEN,
PETITIONERS

v.

NUCLEAR REGULATORY COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

LOUISIANA ENERGY SERVICES, L.P.,
INTERVENOR

———

Consolidated with
06-1310

———

On Petitions for Review of an Order of the
Nuclear Regulatory Commission

———

*Lindsay A. Lovejoy, Jr.* argued the cause and filed the
briefs for petitioners.

*Darani Reddick*, Attorney, U.S. Nuclear Regulatory Commission, argued the cause for respondents. With her on the brief were *John A. Bryson*, Attorney, U.S. Department of Justice, *Karen D. Cyr*, General Counsel, U.S. Nuclear Regulatory Commission, *John F. Cordes, Jr.*, Solicitor, *E. Leo Slaggie*, Deputy Solicitor, and *Molly Barkman* and *Geraldine R. Fehst*, Attorneys.

*Michael F. McBride* argued the cause for intervenor Louisiana Energy Services, L.P. in support of respondent. With him on the brief were *David A. Repka* and *John W. Lawrence*.

Before: GINSBURG, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*:  More than 100 nuclear reactors in the United States produce electricity to power American homes and businesses. Those reactors provide about 20 percent of the Nation's electricity.

In this case, the Nuclear Regulatory Commission granted a license for a new, privately owned facility in New Mexico to produce enriched uranium as fuel for nuclear reactors. Individuals who live near the facility objected to the license, and they filed petitions for review in this Court. Petitioners contend that the NRC violated the National Environmental Policy Act and the Atomic Energy Act in granting the license. We deny the petitions and uphold the NRC's decision to grant the license.

3

I

For several decades after the development of nuclear power in the 1950s, the Federal Government produced all of the enriched uranium used to fuel America's nuclear reactors. In the early 1990s, Congress privatized the uranium enrichment operations; it formed the United States Enrichment Corporation and later approved the sale of that company. *See* USEC Privatization Act, Pub. L. No. 104-134, §§ 3101-17, 110 Stat. 1321, 1321-335 to -350 (1996); Energy Policy Act of 1992, Pub. L. No. 102-486, Title IX, 106 Stat. 2776, 2923. Today, USEC operates the country's only uranium enrichment plant, which is in Kentucky.

In 1990, Congress also amended the Atomic Energy Act so that the Nuclear Regulatory Commission could license the construction and operation of additional uranium enrichment plants that would be privately owned and operated. *See* Solar, Wind, Waste, and Geothermal Power Production Incentives Act of 1990, Pub. L. No. 101-575, § 5, 104 Stat. 2834, 2835-36 (codified as amended at 42 U.S.C. § 2243). During the next 13 years, the NRC received two such applications for uranium enrichment facilities, both filed by Louisiana Energy Services, L.P. (LES). In 1991, LES applied to build the "Claiborne" enrichment facility near Homer, Louisiana; LES later withdrew that application. *See In re La. Energy Servs. L.P.*, 47 N.R.C. 113, 114-15 (1998). In December 2003, LES sought a license for the so-called National Enrichment Facility near Eunice, New Mexico. That second application is at issue in this case.

Among other things, an applicant for a private-sector enrichment facility must present a "plausible strategy" for disposing of the nuclear waste that the facility will generate. An applicant must provide a reasonable cost estimate to

accompany the disposal strategy and give the NRC adequate assurance that the applicant can pay for disposal. 42 U.S.C. § 2243(d)(2); 10 C.F.R. § 70.25; *In re La. Energy Servs., L.P.*, 34 N.R.C. 332, 337 (1990). The NRC must conduct an "adjudicatory hearing on the record" to ensure the applicant has met all the requirements for licensure, and it must prepare an environmental impact statement under the National Environmental Policy Act "before the hearing . . . is completed." 42 U.S.C. § 2243(a)(1), (b)(1), (2); *see also* 42 U.S.C. § 4332(2)(C).

After LES's application in this case, the NRC issued a notice of hearing and opportunity for interested parties to intervene in the licensure proceeding. Notice of Receipt of Application for License, 69 Fed. Reg. 5873, 5874 (Feb. 6, 2004). Two organizations – Public Citizen and the Nuclear Information and Resource Service – jointly filed a petition to intervene. Pursuant to NRC regulations, they challenged several aspects of LES's application. *See* 10 C.F.R. § 2.309(a) (requiring that parties specify "contentions which [they] seek[] to have litigated in the hearing"). The NRC assigned the conduct of the licensure proceeding to a three-member Atomic Safety and Licensing Board, which considered petitioners' contentions in a series of on-the-record hearings. The NRC then heard appeals from the Licensing Board's decisions.

At the Licensing Board, petitioners alleged that the NRC's environmental impact statement had not adequately assessed the environmental impact of the proposed facility – particularly the environmental hazards associated with uranium waste disposal. The Licensing Board issued written rulings examining the environmental effects of the facility and denying petitioners' claims. The NRC upheld the

Licensing Board's determinations in written rulings that further analyzed the environmental issues.

Petitioners also alleged that LES had not articulated a plausible strategy to dispose of the waste generated by the facility, and that it had not provided a reasonable estimate of disposal costs. The Licensing Board considered LES's two alternative disposal strategies and the related cost estimates. First, the Licensing Board evaluated LES's "private-sector strategy" and cost estimate for disposal at a private facility outside of New Mexico. On this point, the Licensing Board ruled for petitioners, holding that LES had not met its evidentiary burden to establish that the cost estimate for the private-sector strategy was reasonable. The NRC affirmed that conclusion.

The Licensing Board also analyzed LES's alternative, "public-sector strategy." To support that strategy, LES relied on a law that requires the Department of Energy to take title to and dispose of "low-level radioactive waste" generated by uranium enrichment facilities. *See* 42 U.S.C. § 2297h-11. The Licensing Board found the strategy plausible and rejected petitioners' challenge to the cost estimate for the strategy. The NRC upheld the Licensing Board's decision, thus basing its ultimate approval of the license on LES's public-sector strategy and cost estimate, rather than on LES's private-sector plan.

In March 2006, as it was considering petitioners' contentions, the Licensing Board held a public hearing on the remaining issues associated with the enrichment facility. The Board held this hearing to meet the mandatory hearing requirement of 42 U.S.C. § 2243(b). In June 2006, the Licensing Board completed its review and authorized a 30-year license for construction and operation of the facility.

The NRC declined to disturb the Licensing Board's authorization of the license, and the decision became final in early August 2006. Construction has now begun.

Petitioners filed timely petitions for review in this Court. They raise several objections to the NRC's licensing decision: (1) the NRC violated the Atomic Energy Act by "supplementing" the environmental impact statement during the hearing process; (2) the NRC violated the National Environmental Policy Act by failing to adequately address the environmental consequences of disposing of the facility's uranium waste; (3) the NRC violated the Atomic Energy Act by accepting LES's waste disposal strategy and cost estimate; and (4) NRC Commissioner McGaffigan should have disqualified himself from the licensure proceeding. We address each issue in turn.

II

Before deciding petitioners' claims, we first must determine whether they have standing.

Under Article III of the Constitution, federal courts have jurisdiction only to decide cases or controversies. One aspect of the case-or-controversy requirement is that a party must demonstrate standing to sue – that it has suffered a "concrete and particularized" injury that is "actual or imminent"; "caused by, or fairly traceable to, an act that the litigant challenges in the instant litigation"; and "redressable by the court." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (internal quotation marks omitted). An organization may establish Article III standing by showing, among other things, that at least one of its members would have standing to sue in his or her own right. *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1265 (D.C. Cir. 2004).

This is a "procedural rights" case in which a party "has been accorded a procedural right to protect his concrete interests." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). A party has standing to challenge an agency's failure to follow a procedural requirement "so long as the procedures in question are designed to protect some threatened concrete interest of" the party. *Id.* at 573 n.8. The Supreme Court and this Court have repeatedly held that individuals who live near a proposed federal project and allege that they will suffer concrete injury from the project have standing in NEPA and other procedural rights cases. *See, e.g.*, *id.* at 572 n.7 (standing for "one living adjacent to the site for proposed construction of a federally licensed" project, even where party "cannot establish with any certainty" that remedying procedural defect "will cause the license to be withheld or altered"); *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684-85 (D.C. Cir. 2004) (standing where parties' neighborhoods would "be subjected to increased noise"); *Nuclear Energy Inst.*, 373 F.3d at 1265-66 (standing where member alleged hazardous waste would "contaminate his community's ground-water supplies"); *cf. Fla. Audubon Soc'y*, 94 F.3d at 667-68 (no standing where parties alleged only a "general risk" of harm and did not demonstrate a "geographic nexus to any asserted environmental injury").

Petitioners here live near the proposed uranium enrichment facility. They allege a risk of injury from radiation generated by the facility; in particular, they allege that because the NRC has not identified a suitable disposal strategy for the waste the facility will produce, the waste will be stored at the facility site and will emit harmful radiation. *See, e.g.*, Declaration of Phillip C. Barr, at ¶¶ 3, 6-10, 13-16. They assert claims that, if successful, would require the NRC to take additional procedural steps before granting the license

and would at least temporarily prevent construction and operation of the facility near their homes. Petitioners' claims suffice to give them standing under the precedents of the Supreme Court and this Court.

## III

Under the National Environmental Policy Act, a federal agency proposing a major federal action significantly affecting the quality of the human environment must first prepare an "environmental impact statement" that includes a "detailed statement" on "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented," and "(iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(i)-(iii). Section 193 of the Atomic Energy Act specifically requires the NRC to prepare an EIS in connection with uranium enrichment facility applications before the hearing on the license is completed. *See* 42 U.S.C. § 2243(a)(1), (2).

Petitioners allege that the NRC violated the Atomic Energy Act by "supplementing" the EIS after the hearings on the license application. They also contend that, under NEPA, the EIS did not adequately address the environmental impact of disposing of the waste generated by the facility.

### A

We first consider petitioners' claim that the NRC violated the Atomic Energy Act by "supplementing" the EIS after the close of hearings on the license application.

Section 193 of the Atomic Energy Act requires the NRC to conduct a "single adjudicatory hearing on the record" before issuing a license for constructing and operating a

uranium enrichment facility.  42 U.S.C. § 2243(b)(1), (2); *see also* 10 C.F.R. §§ 70.23a, 70.31.  It also sets the deadline for preparing the EIS:

> An environmental impact statement . . . shall be prepared *before the hearing* on the issuance of a license for the construction and operation of a uranium enrichment facility *is completed*.

§ 2243(a)(2) (emphases added).  NRC staff released the draft EIS for public review in September 2004 and then issued the final EIS in July 2005 – well before both the NRC's principal rulings on petitioners' contentions and the "mandatory hearing" in March 2006 on the remaining, uncontested issues.  As this timeline demonstrates, the NRC satisfied the Section 193 requirement that an EIS "be prepared *before* the hearing . . . *is completed*."  § 2243(a)(2) (emphases added).

Petitioners nonetheless claim that the EIS was not "prepared" before the hearing was completed because the written opinions of the Licensing Board and the NRC "supplemented" the EIS.  In its ruling after the mandatory hearing, the Licensing Board considered the EIS and stated that a staff document and the related discussion in the Board's opinion were intended to "supplement[]" the EIS.  63 N.R.C. 747, 819 (2006).  Similarly, when ruling on one of petitioner's environmental contentions, the NRC included a detailed analysis of various waste disposal options and stated that the passage "amplified" the related discussion in the final EIS.  63 N.R.C. 687, 700 (2006).  Those points are irrelevant to the statutory question here, however, because the agency still "prepared" an EIS before the hearing was completed,

which is all that this provision of the Atomic Energy Act requires.[1]

B

We next address petitioners' claim that the NRC's NEPA review was deficient.

Judicial review of an environmental impact statement ensures that the agency "has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97-98 (1983). A court reviewing an EIS considers whether an "agency took a 'hard look' at the environmental consequences of its decision to go forward with the project." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004) (internal quotation marks omitted). We bear in mind, of course, "that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

Petitioners argue that the NRC's NEPA review was deficient because the NRC did not sufficiently analyze the impact of disposal of uranium waste from the enrichment facility. Petitioners are incorrect: The NRC thoroughly examined the environmental consequences of waste disposal.

Multiple sections of the EIS discussed the waste that the enrichment facility would generate and the environmental impact of various waste disposal alternatives. *See* EIS

---

[1] Petitioners have not argued that the NRC's method of supplementing the EIS violated its regulations implementing NEPA. *See* 10 C.F.R. § 51.92.

Excerpts, Joint Appendix ("J.A.") 1907-11 (discussing "Waste-Management Options" for the facility and "Disposal Options" for waste); J.A. 1907 (outlining "near-surface emplacement" alternatives). The EIS described potential private- and public-sector disposal facilities that are licensed to accept various types of low-level waste; it described different scenarios for converting and transporting the waste; and it analyzed the environmental effects of the various options. In addition to the EIS document, the Licensing Board and the NRC subsequently developed an exhaustive record as they considered petitioners' environmental contentions and supplemented the EIS. Among other things, the NRC further analyzed the "long-term effects from disposing of depleted uranium," concluding that the potential environmental effects of disposal at one proposed disposal site in Utah "appear to be small," and describing various alternative disposal options. 63 N.R.C. 687, 690, 700 (2006).[2]

In short, the record makes clear that the NRC thoroughly considered the environmental issues surrounding uranium waste disposal. The agency plainly met its NEPA obligation to take a "hard look" at the environmental consequences of approving the license.

IV

Petitioners strenuously argue that the NRC erred in approving the license because, in petitioners' view, LES failed to present a reasonable cost estimate for disposing of radioactive waste from the facility.

---

[2] Contrary to petitioners' claims, NRC staff independently analyzed the characteristics of the "reference site" in Utah and the potential effects of storing the facility's waste there. 63 N.R.C. 687, 693 (2006).

A license applicant need not present a "concrete plan" to dispose of waste generated by a proposed uranium enrichment facility. *In re La. Energy Servs., L.P.*, 34 N.R.C. 332, 337 (1991). Rather, an applicant must present "a *plausible strategy* for the disposition of depleted uranium" waste. *Id.* (emphasis added).[3] An applicant also must present a reasonable estimate of the costs of disposal and give adequate assurance it can pay those costs. 42 U.S.C. § 2243(d)(2); 10 C.F.R. § 70.25(a), (e).

The NRC granted the license here based on LES's "public-sector strategy," in which the Department of Energy would take title to and dispose of the facility's waste.[4] Petitioners do not challenge the plausibility of giving the waste to the Department of Energy; they acknowledge that the Department is legally required to take title to the waste at LES's request, with LES bearing the disposal costs. *See* 42 U.S.C. § 2297h-11(a)(1), (2). Instead, petitioners contend that LES's *cost* estimate for waste disposal understates the likely costs.

LES's cost estimate started with the Department of Energy's estimate of the cost of waste disposal. To guard against unforeseen costs, LES then added a 25-percent contingency factor on top of the Department's estimate. Petitioners contend, however, that LES should have used a contingency factor far greater than 25 percent because of the

---

[3] Petitioners accept the "plausible strategy" requirement as the governing standard for disposition of depleted uranium waste.

[4] The bulk of petitioners' objections in this Court are to the private-sector strategy. We need not consider those arguments, however, because the NRC approved the license based solely on the public-sector strategy. *See* 10 C.F.R. § 70.25(a) (requiring only one plan to pay disposal and other costs).

Department's alleged history of underestimating costs on other projects.

To be sure, cost overruns are not uncommon for this kind of massive project. *See* GOV'T ACCOUNTABILITY OFFICE, DEPARTMENT OF ENERGY: MAJOR CONSTRUCTION PROJECTS NEED A CONSISTENT APPROACH FOR ASSESSING TECHNOLOGY READINESS TO HELP AVOID COST INCREASES AND DELAYS 9 (2007) (cost of "many" Department projects has "significantly exceeded original estimates"). The NRC found petitioners' evidence on this point unpersuasive, however, because it concerned only the Department of Energy's "cost overruns on unrelated prior projects." 64 N.R.C. 37, 46 n.38 (2006). The NRC explained that it has previously rejected such past-misbehavior arguments unless parties show a "'direct and obvious relationship between the character issues and the licensing action in dispute.'" *Id.* (quoting *In re Dominion Nuclear Conn., Inc.*, 54 N.R.C. 349, 365 (2001)). Petitioners present no basis for us to upset the NRC's conclusion that this *particular* estimate, with the 25-percent contingency included, was reasonable.[5]

At oral argument, petitioners expressed particular concern with the cost estimate for the public-sector strategy because it was based on "near-surface disposal" of the facility's waste relatively near the surface of the earth – as opposed to "deep disposal" hundreds or thousands of feet underground. Petitioners contend that deep disposal will be

---

[5] Petitioners also have asked for a Licensing Board hearing on whether the 25-percent contingency factor was sufficient. The NRC examined petitioners' challenge on the merits, however, and reasonably determined that the 25-percent contingency factor was sufficient and that evidence of overruns on other Department of Energy projects did not merit further Licensing Board proceedings.

necessary because of the nature of the waste the facility will generate; that deep disposal will cost significantly more than near-surface disposal; and that LES will not have the funds to pay for the higher costs of deep disposal. This is a weighty argument, and we assume the NRC legally could have required LES to demonstrate it could pay for deep disposal. But the NRC instead required only a showing that LES could pay for near-surface disposal; the NRC concluded that near-surface disposal of the waste from this facility is permissible under current federal regulations. As a reviewing court, our role here is necessarily limited: We are not authorized to micromanage the NRC's licensure proceeding, or to second-guess its acceptance of reasonable cost estimates. We examine only whether the NRC reasonably concluded that LES presented a *plausible* strategy for waste disposal and a *reasonable* cost estimate to accompany that strategy – the plausible strategy being disposal by the Department of Energy, and the cost estimate including a 25-percent contingency above the Department's estimate for the costs of near-surface disposal. We have no basis on this record, particularly given our deferential review, to disturb the NRC's determination that LES's cost estimate based on near-surface disposal was reasonable.

V

Finally, petitioners contend that NRC Commissioner McGaffigan (who has since passed away) should have disqualified himself from considering the license application. Petitioners moved to disqualify Commissioner McGaffigan because, in an unrelated proceeding, he stated that the Nuclear Information and Resource Service had used "factoids or made-up facts or irrelevant facts" to support its positions, and that one of its expert witnesses was a "person who doesn't know anything about radiation." Motion at 2-3, J.A.

1167-68. In that same proceeding, Commissioner McGaffigan characterized the group as the "Nuclear Disinformation Resource Service." *Id.* at 3, J.A. 1168. Petitioners argue that the licensure decision should be vacated so that the proceeding can be conducted anew by an impartial panel. We review Commissioner McGaffigan's denial of petitioners' disqualification motion for abuse of discretion. *Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1164 (D.C. Cir. 1995).

Given the roles that agency officials must play in the give-and-take of sometimes rough-and-tumble policy debates, courts must tread lightly when presented with this kind of challenge. Administrative officers are presumed objective and "capable of judging a particular controversy fairly on the basis of its own circumstances." *United States v. Morgan*, 313 U.S. 409, 421 (1941). A party cannot overcome this presumption with a mere showing that an official "has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute." *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1981) (citing *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 493 (1976) and *Morgan*, 313 U.S. at 421). Instead, an agency official should be disqualified only where "a disinterested observer may conclude" that the official "has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it." *Cinderella Career & Finishing Sch., Inc. v. FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) (internal quotation marks omitted); *Metro. Council*, 46 F.3d at 1164-65.

Here, as the Commissioner noted, his "personal style" was to "speak vigorously, sometimes colorfully," to "spark debate." Decision on Motion at 3, J.A. 1311. Such comments, particularly when made in an entirely separate

proceeding, do not support the conclusion that Commissioner McGaffigan had "adjudged the facts as well as the law" regarding the particular license application at issue here. Commissioner McGaffigan did not abuse his discretion in denying petitioners' motion.

\* \* \*

We deny the petitions for review and uphold the NRC's decision to grant the license.

*So ordered.*