**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1965
_____

TRENTON THREATENED SKIES, INC; BOROUGH OF
YARDLEY, Pennsylvania; TOWNSHIP OF LOWER
MAKEFIELD, Pennsylvania; BRANDON FARMS
PROPERTY OWNERS ASSOCIATION INC; JULIE
SILL YOGA; DEBRA BASEMAN; CRAIG
DEARDORFF; ELEANOR DEARDORFF; LISA
FISCHETTI; TANICE FITZPATRICK; PAMELA
JENSEN; JOYCE JOHNSON; LAURA LANNING;
ROBERT LANNING; DEBRA JEAN MERCER; TAHER
MOHAMAD-ALI; VRUNDA PATEL; ELIZABETH
PECK; ELWOOD PHARES; HADLEY PHARES;
JACQUELINE PHARES; MELISSA PHARES,
ALEXANDRA POWERS; RICHARD PRESTON;
KATHRYN HUGHES REDMOND; JUMANA SOUDAH;
DEREK STRAUT; GRANT WARD; LESLIE WARD;
RICHARD WAYNE; CYNTHIA WEINSTEIN;
RICHARD WESTHOUSE,
Petitioners

v.

FEDERAL AVIATION ADMINISTRATION; BILLY NOLEN, in his official capacity as Acting Administrator, Federal Aviation Administration; UNITED STATES DEPARTMENT OF TRANSPORTATION; PETE BUTTIGIEG, in his official capacity as Secretary

_____

On Petition for Review of a
Decision of the Federal Aviation Administration

_____

Argued November 8, 2023

Before: RESTREPO, SCIRICA, and SMITH, *Circuit Judges*

(Filed: January 4, 2024)


Steven M. Taber [**ARGUED**]
Leech Tishman Fuscaldo & Lampl
200 S Robles Avenue
Suite 300
Pasadena, CA 91101
        *Counsel for Petitioners*

Justin Heminger
United States Department of Justice
Environment & Natural Resources Division
950 Pennsylvania Avenue NW
Washington, DC 20530

Rebecca Jaffe [**ARGUED**]
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
          *Counsel for Respondents*

Peter J. Kirsch
W. Eric Pilsk [**ARGUED**]
Kaplan Kirsch & Rockwell
1634 I Street, NW
Suite 300
Washington, DC 20006
          *Counsel for Intervenor Respondent*

_____

OPINION OF THE COURT

_____

**SMITH**, *Circuit Judge*.

## I.    INTRODUCTION

Municipal, individual, and organizational Petitioners filed a petition to review the Federal Aviation Administration's ("FAA's") March 21, 2022 "Finding of No Significant Impact and Record of Decision – Trenton-

Mercer Airport Terminal Area Improvements" ("FONSI"), to determine whether it violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* Petitioners assert that: (1) the FAA's decision was arbitrary and capricious; (2) the FAA failed to consider the cumulative impact of its past actions; (3) the agency unlawfully segmented its review of interconnected and interdependent projects in expanding the Airport; (4) it conducted an unreasonable environmental justice analysis; and (5) the FAA failed to meet the Act's requirement of completing a health risk assessment. Because each of these assertions lacks merit, we will deny the Petition.

## II. FACTUAL BACKGROUND

Mercer County owns and operates the two-runway Trenton-Mercer Airport (the "Airport"), located in Ewing Township, New Jersey, four miles northwest of the state capital. Frontier Airlines, a low fare air carrier that offers frequent flights, has provided commercial service at the Airport continuously since 2013. After it was constructed in 1975, the Airport had fewer than 55,000 passengers yearly. It now has over 350,000 annual passengers.

The Airport's aging terminal building no longer complies with ADA standards or TSA requirements, having been built before the implementation of such requirements. Many of the Airport's inadequacies stem from spatial limitations. The terminal has about half the

4

space recommended for security screening lanes. At 24,780 square feet, the terminal[1] is 92,000 square feet smaller than recommended by federal guidelines.[2] And it fails to meet fire egress requirements, in addition to having heating, ventilation, air conditioning, plumbing, roofing, and windows "in various stages of aging and disrepair." AR60.

Based on ACRP criteria, the Airport has 'earned' an F grade for its Level of Service ("LOS"), which relates to passenger congestion and the length of queues that passengers encounter within an airport terminal.[3] That is

---

[1] With passenger parking, the terminal size is 29,000 square feet.

[2] These include TSA's *Checkpoint Design Guide*, the FAA Advisory Curricular 150/5360-13 (AC) *Planning and Design Guidelines for Airport Terminal Facilities*, the FAA Advisory Curricular (AC) 150/5360-13 *Planning and Design of Airport Terminal Facilities at Non-Hub Locations*, and the Airport Cooperative Research Program ("ACRP") Report *Passenger Level of Service and Spatial Planning for Airport Terminals*.

[3] The FONSI explains that the LOS "often relates to the degree of congestion or crowding experienced by travelers at the processing points within a building that include the ticketing counter/area, the security checkpoint, the

the lowest possible grade and "an unacceptable LOS that consists of cross flows, system breakdown, unacceptable delays, and unacceptable level of comfort." AR5-6. An airport's LOS grade "is based upon quantitative and qualitative analysis of the functions and operations within the building, comparisons with other airport terminals, and standards/recommendations for terminal programming and space planning." *Id.*

Not surprisingly, conditions at the Airport present various challenges for passengers. The terminal does not have enclosed jet bridges for boarding and disembarking from aircraft. Passengers must traverse an unprotected apron, prompting concerns about passenger safety during adverse weather conditions. Additionally, to meet terminal functional area requirements, the terminal needs about 2,345 square feet of restroom space, 3,570 square feet of family waiting area space, and 3,390 square feet of passenger security screening space. Because of the terminal's limited available space, the Airport leases approximately 5,000 square feet of off-site space for both

---

holdroom/gate, and baggage claim within the terminal building." AR5-6. Further, "[i]t may also be a measure of the amount of waiting or processing time, or the length of the queues or lines encountered by travelers at these locations within a terminal." AR6.

administrative offices and law enforcement—functions normally located inside airport terminals.

Mercer County completed an Airport Master Plan Update ("AMPU") in 2018, recommending a new terminal for the Airport. The AMPU proposed building a 125,000 square foot replacement structure (the "Project"). This came to be known as Terminal Building Replacement Alternative 4C ("Alternative 4C"). The County designed the new terminal using sizing and planning guides,[4] basing the design on factors including maximum waiting time, seating, occupancy, social distancing, security, and carry-on bag space. The new terminal design includes ten ticket counters, three TSA screening lanes, expanded baggage claim facilities, larger passenger waiting areas, enhanced concessions, reconfigured parking areas, and a parking garage. With these proposed upgrades, Alternative 4C would operate at a minimum C grade under the ACRP criteria. By relocating its Aircraft Rescue and Firefighting Facility, vehicle impound lot, and canine kennels, the

---

[4] These include the FAA Advisory Curricular (AC) 150/5360-13, *Planning and Design Guidelines for Airport Terminal Facilities*; the FAA AC 150/5360-9, *Planning and Design of Airport Terminal Facilities at Non-Hub Locations*; TSA's *Checkpoint Design Guide (CDG)*; ACRP Report 25, *Airport Passenger Terminal Planning and Design*; and ACRP Report 55, *Passenger Level of Service and Spatial Planning for Airport Terminals*.

County would create more space for construction. It would demolish the existing terminal after completion of the new one.

The FAA prepared an environmental assessment ("EA"), to which it attached technical reports as appendices. The reports included an analysis of the Project's potential effects on noise using an FAA-approved noise model, the Aviation Environmental Design Tool, and a Traffic Engineering Report. The EA set out four alternatives: (1) a no action alternative; (2) building a new terminal in different potential locations on the Airport property; (3) reconstructing and retrofitting the existing terminal; and (4) building a replacement terminal. It determined that building a new terminal, specifically Alternative 4C (the alternative the FAA eventually approved), would offer an energy-efficient building at a lower cost than other designs considered.

The FAA determined, using the ACRP Airport Construction Emissions Inventory Tool, that construction emissions would be below the EPA's General Conformity de minimis thresholds for air pollutants. That tool estimates emissions for construction activities by considering project dimensions, equipment use, labor hours, engine horsepower, and vehicle trips. To follow best practices to reduce construction-related health and environmental impacts, Mercer County made various commitments, including suspending or adjusting construction activities during sustained high winds,

8

decreasing speed limits to reduce dust, and limiting engine idling.

The FAA also used a modeling tool to determine that the Project would not cause significant noise impacts, and it ensured that construction activities would comply with the Noise Control Ordinance for the Township of Ewing, the municipal subdivision in which the Airport is located. The Final EA stated: "The analysis found no change in noise levels outside of the airport property as a result of the proposed project."[5]

Mercer County offered several opportunities for public comment and participation prior to finalizing the

---

[5] The Airport employs noise abatement procedures "based on the weight and size of the aircraft," and "when a noise complaint is submitted by either the online portal, telephone, or mail it is entered into the database in the Noise Reporting Portal for [the Airport]." AR270-71. After receiving a noise complaint, the "Airport staff calls the individual owner, operator, or pilot with the phone number they provide to inform them of the complaint or voluntary curfew violation." AR271. The Airport's Voluntary Nighttime Flight Curfew extends from 12AM to 6AM, and if a registered aircraft owner violates this curfew, the owner "receive[s] a Notice of Violation as well as information on all noise abatement procedures at [the Airport]," "regardless of whether or not a noise complaint was filed." *Id.*

EA. It first held public meetings in October 2018 and January 2019. Before and after a formal presentation, the public could inspect display materials from the consultant team preparing the EA. "Both meetings included public question and answer sessions with the consultant team preparing the EA." AR26. The County published several newspaper notices, in English and Spanish, explaining that public comment regarding the draft EA could be submitted during a 45-day window (from May 3 to June 16, 2021). And in June 2021, it held another public hearing to receive comments, at which Spanish translation services were offered. That hearing was conducted virtually due to the COVID-19 pandemic.

Mercer County received over 400 written comments. It also sought input from Tribal, state, local, and federal agencies (other than the FAA). Appendix I of the Final EA addressed the comments that were received.

Ultimately, the FAA issued a FONSI as required by NEPA. The FAA approved the Project in March 2022, authorizing the County to build the new Alternative 4C terminal.

### III.  PROCEDURAL BACKGROUND

In May 2022, Petitioners sought review of the FAA's FONSI decision, which approved the County's plan to build a new terminal. Mercer County, as the Airport's owner and operator, intervened in support of Respondents to defend the FAA's decision.

10

## IV. JURISDICTION

The Court has jurisdiction under 49 U.S.C. § 46110(a), which provides the federal courts of appeals with exclusive jurisdiction to review FAA orders. Additionally, the Court has subject-matter jurisdiction because the Municipal, Individual, and Organizational Petitioners all have standing.

While Respondent FAA "notes that the municipal petitioners 'cannot establish standing . . . premised on the alleged harm to their residents,'" Resp. Br. at 3 n.2, it cites only *City of N. Miami v. FAA*, 47 F.4th 1257, 1277 (11th Cir. 2022). There, a panel of the Eleventh Circuit recognized that "[t]he problem for the municipalities is that '[a] State does not have standing as *parens patriae* to bring an action against the Federal Government.'" *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982)). The court went on to explain that because "municipalities derive their existence from the state and function as political subdivisions of the state, presumably they too cannot sue the federal government under the doctrine of *parens patriae*." *Id.* (quoting *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002)). But here the Municipal Petitioners, the Borough of Yardley and Lower Makefield Township, have alleged an injury that affects each *municipality*, not only its residents.

11

The Municipal Petitioners' alleged injury, discussed in greater detail below, is set forth in declarations outside the administrative record. In a case since reversed on other grounds, our Court explained: "It is well established that petitioners challenging agency action may supplement the administrative record for the purpose of establishing Article III standing, even though judicial review of agency action is usually limited to the administrative record." *Prometheus Radio Project v. FCC*, 939 F.3d 567, 578 (3d Cir. 2019), *rev'd on other grounds*, 592 U.S. 414 (2021); *see also US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012); *Texas Indep. Producers and Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 971 (7th Cir. 2005); *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997). Thus, we can consider Petitioners' declarations, though outside the administrative record, for purposes of deciding if they have standing.

Here the Municipal Petitioners have standing based on an alleged loss of property value. The Supreme Court held that a municipality experienced injury-in-fact via realtors' racial discrimination that produced a "significant reduction in property values [that] directly injures a municipality by diminishing its tax base, thus threatening its ability to bear the costs of local government and to provide services." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 200 (2017) (quoting *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979)). In their

12

supplemental record, Petitioners include a Declaration of the Borough of Yardley Council President, which states: "The increased flight traffic at the Airport and the expansion of flight traffic that will result from the Project has harmed Yardley's real property interest in the properties and facilities that Yardley itself owns or has a real property interest in." Appx. 396. The Declaration also states that increased flight traffic at the Airport has and will continue "adverse[ly] impact[ing] Yardley's proprietary interest in protecting the health, safety, and welfare of its citizens from aircraft noise and air pollution," "will significantly reduce the values of properties within Yardley," and will "impact Yardley's budget goal, its economic interest and proprietary interests." *Id.* The Chair of the Board of Supervisors for Lower Makefield Township, the other Municipal Petitioner, asserted the same for Lower Makefield. Appx. 398.

## V.    STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, grants us jurisdiction to review final decisions of the FAA. Under the APA, a court may "set aside agency action, findings, and conclusions" that it determines to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Thus, an agency action must "be reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. We must "ensure[] that the agency has acted within a zone

13

of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id.* That requires us to review an administrative record[6] "to ascertain that the agency has made a reasoned decision based on reasonable extrapolations from some reliable evidence, to ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sw. Pa. Growth All. v. Browner*, 121 F.3d 106, 117 (3d Cir. 1997) (quoting *Am. Mining Cong. v. EPA*, 907 F.2d 1179, 1187 (D.C. Cir. 1990)).

Reviewing courts must show deference to an agency's judgment when considering whether it has violated NEPA. The Supreme Court has explained that "[n]either the statute nor its legislative history contemplates that a court should substitute its judgment

---

[6] Under the APA, judicial review must be based on "the whole record or those parts of it cited by a party." 5 U.S.C. § 706(2); *see Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). Thus, "the administrative record cannot normally be supplemented." *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 189 (3d Cir. 2006) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam)). This Court accordingly denied Petitioners' Motion to Supplement the Administrative Record, or in the Alternative, Request for Judicial Notice.

for that of the agency as to the environmental consequences of its actions." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (internal citation omitted). A court's role is limited to ensuring that "the agency has taken a 'hard look' at the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Id.* (quoting *Nat. Res. Def. Council v. Morton*, 458 F.3d 827, 838 (1972)); *see also Twp. of Bordentown v. FERC*, 903 F.3d 234, 248 (3d Cir. 2018). Neither NEPA nor its implementing regulations specify procedures for how a "hard look" should be conducted. *Del. Dep't of Nat. Res. & Env't Control v. U.S. Army Corps of Eng'rs*, 685 F.3d 259, 270 (3d Cir. 2012).

Moreover, the FAA is entitled to a presumption of regularity, which "ensures that [courts] give proper deference and respect to the official actions of an agency." *Advanced Disposal Servs. E., Inc. v. NLRB*, 820 F.3d 592, 604 (3d Cir. 2016). Courts may "presume that what appears regular is regular, [with] the burden shifting to the attacker to show the contrary.'" *Id.* (first quoting *Butler v. Principi,* 244 F.3d 1337, 1340 (Fed. Cir. 2001); and then citing *Kamara v. Att'y Gen.*, 420 F.3d 202, 212 (3d Cir. 2005)).

## VI. ANALYSIS
### a. NEPA BACKGROUND

Petitioners challenge the FAA's order pursuant to NEPA. "NEPA is primarily a procedural statute, designed to ensure that environmental concerns are integrated into the very process of agency decisionmaking." *Morris Cnty. Tr. for Historic Pres. v. Pierce*, 714 F.2d 271, 274 (3d Cir. 1983); *see also Twp. of Bordentown*, 903 F.3d at 248. NEPA also aims "to inform the public that an agency has considered environmental concerns in its decision-making process." *Morris Cnty. Tr. for Historic Pres.*, 903 F.3d at 274 (citing *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 142-43 (1981)); *Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017).

Under NEPA:

The Congress authorizes and directs that, to the fullest extent possible . . .

(2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

16

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA. *See* 40 C.F.R. § 1500.1 *et seq.* These regulations require an agency to prepare an EA to determine whether to draft either an Environmental Impact Statement ("EIS") or a FONSI. 40 C.F.R. §§ 1501.4, 1508.9, 1508.13. An agency develops a FONSI if it has determined that an action will

"not have a significant effect on the human environment," which obviates the need for an agency to write an EIS. 40 C.F.R. § 1508.13; *see also Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir. 1998).

Environmental reviews conducted pursuant to NEPA do not "necessarily dictate any substantive outcome." *Morris Cnty. Tr. for Historic Pres.*, 714 F.2d at 274-75 (citing *Twp. of Lower Alloways Creek v. Public Service Electric,* 687 F.2d 732, 739 n.13 (3d Cir. 1982)). Indeed, we have interpreted NEPA as "merely intended to make decision makers aware of the potential environmental ramifications of their actions." *Id.* at 275 (citing same).

### b. THE FAA DID NOT VIOLATE NEPA BY RELYING ON FALSE PREMISES OR INACCURATE OR FALSE INFORMATION

Petitioners contend that the FAA's FONSI violated NEPA by relying on false premises or inaccurate or false information.[7] Specifically, they submit that the FAA

---

[7] In making this argument, Petitioners asserted that the FAA "conspired" to make false claims, Reply Br. at 9, "l[ied] about expanding the Airport," *id.*, "repeatedly mischaracterized the scope, and thus the impact, of the Project," *id.* at 13, and "rel[ied] on false premises" Pet'r's Br. at 25. They also claimed that the Final EA "[l]acks [p]rofessional and [s]cientific [i]ntegrity" *id.* at 28, because it used "obsolete" scientific methods, Reply Br. at

erroneously determined that the Project does not expand the terminal and that it will not induce air traffic growth. However, the record indicates that (1) the FAA reasonably concluded that the new terminal would not induce growth because the forecasts of future air traffic predict a substantial increase regardless of whether a new terminal is built, and (2) the new terminal will have the same number of gates and aircraft parking spaces as the existing terminal.

First, the FAA reasonably determined that air traffic would likely grow at the Airport regardless of whether Mercer County builds a new terminal. The air traffic forecasts that the FAA approved "considered multiple growth considerations such as national trends, FAA's Terminal Area Forecast ("TAF"), and local socioeconomic conditions." AR6522. The growth rate without accounting for a new terminal is consistent with the TAF, which means "it differs by less than ten percent

18. They went so far as to accuse Respondents as follows: "[i]nstead of being honest with Petitioners, FAA and Mercer County have chosen to view the Petitioners as opponents to be lied to and deceived in the name of increasing revenues at the Airport." Reply Br. at 37. As noted at the conclusion of oral argument, this "is not the kind of language that we're accustomed to reading in the briefs presented to us or that we see as appropriate for argument in a court of law." Tr. at 31.

in a 5-year forecast period, and 15% in the 10-year forecast period."[8] Further, the FAA recognized that fluctuation is to be expected for actual enplanements. As we have recognized, "we accord deference to the FAA's demand forecasts." *Tinicum Twp. v. U.S. Dep't of Transp.*, 685 F.3d 288, 298 (3d Cir. 2012); *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1136 (9th Cir. 2011).

Second, the FAA weighed alternatives in its Final EA. In doing so, it noted that "[t]he existing terminal is currently operating above maximum capacity and cannot accommodate either the existing level of enplanements or the forecasted growth with a reasonable level of passenger comfort and convenience." AR81. Thus, it determined that a no-action alternative would fail to meet the purpose and need requirements. *See* FAA Order 1050.1F6-2.1(c)

---

[8] National forecasts by the FAA predict an average annual growth rate of 1.7 percent for U.S. air traffic between 2014 and 2035. Nationally, as the Airport recognized in the AMPU, "sharper variations in growth for smaller airports like TTN near larger hubs are anticipated" during that time. AR10509. Indeed, "[a]ccording to the FAA approved forecasts, annual passenger enplanements are expected to grow from 314,665 in 2016 to 476,507 in 2035." AR6, AR48.

20

(requiring that an EA include a discussion of purpose and need requirements).[9]

The FAA used the no-action alternative as a baseline to consider the environmental consequences of the project, in accordance with NEPA and FAA Order 1050.1F6-2.1(d).[10] *See Twp. of Bordentown*, 903 F.3d at

---

[9] This regulatory provision states:

> Purpose and Need. This section briefly describes the underlying purpose and need for the Federal action. It presents the problem being addressed and describes what the FAA is trying to achieve with the proposed action. The purpose and need for the proposed action must be clearly explained and stated in terms that are understandable to individuals who are not familiar with aviation or commercial aerospace activities. To provide context while keeping this section of the EA brief, the FAA may incorporate by reference any supporting data, inventories, assessments, analyses, or studies.

FAA Order 1050.1F6-2.1(c).

[10] This regulatory provision states:

21

258 ("An agency can take a 'hard look' at cumulative impacts . . . by . . . incorporating the expected impact of [a

Alternatives (Including the Proposed Action). The alternatives discussed in an EA must include those that the approving official will consider. There is no requirement for a specific number of alternatives or a specific range of alternatives to be included in an EA. An EA may limit the range of alternatives to the proposed action and no action when there are no unresolved conflicts concerning alternative uses of available resources. Alternatives are to be considered to the degree commensurate with the nature of the proposed action and agency experience with the environmental issues involved. Generally, the greater the degree of impacts, the wider the range of alternatives that should be considered. The preferred alternative, if one has been identified, should be indicated. For alternatives considered but eliminated from further study, the EA should briefly explain why these were eliminated. For more information on alternatives, see Paragraph 7-1.1.e.

FAA Order 1050.1F6-2.1(d).

22

forthcoming] project into the environmental baseline against which the incremental impact of a proposed project is measured.") (parenthetically quoting *Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1112 (9th Cir. 2015)).

In 2018, the AMPU considered five different scenarios, which showed air traffic would likely increase regardless of whether Mercer County builds a new terminal. Every scenario showed that air traffic into and out of the Airport would increase substantially between 2014 and 2035.[11] The AMPU relied upon Scenario 5 as it averaged all the other scenarios' growth outcomes. Scenario 5 predicted larger growth than the scenario that considered growth based on the national trend plus a new terminal.[12] The FAA ultimately approved Scenario 5 since it was consistent with the agency's official aviation activity for airports nationwide. And even though a new terminal has yet to be built, passenger trips have already

---

[11] The following scenarios were used in forecasting: Scenario 1 – National Trend Based; Scenario 2 – National Trend Based plus New Terminal Factor; Scenario 3 – Tertiary Airports; Scenario 4 – Air Service Development Based; Scenario 5 – Average of Scenario 1-4.

[12] Scenario 2 predicted 455,560 passenger trips in 2035, compared to Scenario 5, which predicted 476,507 trips in 2035.

23

increased more than the Scenario 5 forecast, "with the Airport reporting a total of 404,349 enplanements in 2018," compared to a predicted growth to 358,728 in 2020. AR54.

Third, Petitioners go to great length arguing that (1) the new terminal would increase air traffic by increasing both the number of terminal gates and aircraft parking positions, and (2) the FAA relied on false information by determining otherwise. Petitioners' focus on the number of gates stems from an acknowledgement in a November 2002 EA that increasing the number of gates was considered at one point in time.[13] But the petition for

_____

[13] This November 2002 EA document explained:

Mercer County's original intent was to build a two-gate facility in the first phase (Build Alternative 1). At a later unspecified date, based upon demand, the second phase (Build Alternative 2) with an additional two gates would have been built. Due to the uncertainty of the need and the anticipated time frame for the second phase, the County of Mercer has designated 2005 Build Alternative 1, a two-gate facility, as the Preferred Alternative to be evaluated in this EA. All references to 2005 Build Alternative 2 are merely included

24

review here identified only the March 2022 decision to allow Mercer County to replace the existing terminal. Federal Rule of Appellate Procedure 15(a)(2)(C) forecloses Petitioners from challenging actions not identified in their petition for review.[14] Additionally, "the APA allows challenges to discrete agency action, but not broad challenges to the administration of an entire program." *Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 317 (3d Cir. 2020). So Petitioners cannot generally argue that, years ago, the terminal should not have been

> as additional information, but not relevant to the decision requested by this EA on the current sponsor's Preferred Alternative. The 2005 Build Alternative 2 will not be permitted to be built on the basis of a favorable decision on this EA, but would require further environmental documentation.

AR 7451.

[14] Challenging actions prior to March 21, 2022 would also be untimely because petitions challenging FAA orders must be filed no later than 60 days after an order issues. 49 U.S.C. § 46110(a). "The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day." *Id.* The agency case here was docketed May 19, 2022.

25

expanded from a two-gate terminal. As the Supreme Court explained in *Lujan v. National Wildlife Federation*:

> [T]he flaws in the entire 'program'— consisting principally of the many individual actions referenced in the complaint, and presumably actions yet to be taken as well— cannot be laid before the courts for wholesale correction under the APA, simply because one of them that is ripe for review adversely affects one of respondent's members.

497 U.S. 871, 893 (1990).

In sum, the record belies Petitioners' argument that the FAA relied on false or inaccurate premises.

### c. THE FAA DID NOT VIOLATE NEPA BY FAILING TO CONSIDER THE CUMULATIVE IMPACT OF ITS PAST ACTIONS OR BY SEGMENTING THE PROJECT

Petitioners contend that the FAA violated NEPA by failing to consider the cumulative impact of its past actions, in part by segmenting the Airport Project and unmooring it from past Airport construction projects. Under NEPA, "if the cumulative impact of a given project and other planned projects is significant, an applicant can not simply prepare an EA for its project, issue a FONSI, and ignore the overall impact of the project on a particular

26

neighborhood." *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 180 (3d Cir. 2000) (citing 40 C.F.R. § 1508.27(b)(7)). The regulations define 'cumulative impact' as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. §1508.7. And "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.*; *see also Soc'y Hill Towers Owners' Ass'n*, 210 F.3d at 180.

NEPA's implementing regulations dictate that "when evaluating a proposed project's environmental impacts, an agency must take account of 'connected,' 'cumulative,' and 'similar actions' whose impacts should be 'discussed in the same impact statement' as the project under review." *Twp. of Bordentown*, 903 F.3d at 248 (quoting 40 C.F.R. § 1508.25(a)); *see also State of N.J., Dep't of Env't Prot. & Energy v. Long Island Power Auth.*, 30 F.3d 403, 411 (3d Cir. 1994). "Connected actions" are those that "(i) [a]utomatically trigger other actions which may require environmental impact statements," "(ii) [c]annot or will not proceed unless other actions are taken previously or simultaneously," or "(iii) [a]re interdependent parts of a larger action and depend on the

27

larger action for their justification." 40 C.F.R. § 1508.25(a)(1).[15]

An agency violates NEPA when it "consider[s] such related actions separately." *Twp. of Bordentown*, 903 F.3d at 248 (citing *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014)). Under the "prevailing view amongst the Courts of Appeals," the "essential question" in determining if segmentation violates NEPA is "whether the segmented projects have independent utility." *Id.* at 249 (citing *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 312 (2d Cir. 2009); *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006)). Projects with independent utility are those in which "each project would have taken place in the other's absence." *Id.* (quoting *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012)).

Petitioners contend that the Final EA ignored that (1) the FAA "allow[ed] Frontier Airlines to begin

---

[15] This prohibition against "segmentation" has also been incorporated into an FAA order. FAA Order 1050.1F2-3.2(b)(1) states that "[c]onnected actions and other proposed actions or parts of proposed actions that are related to each other closely enough to be, in effect, a single course of action must be evaluated in the same EA or EIS. . . . A proposed action cannot be segmented by breaking it down into small component parts to attempt to reduce impacts." (referencing 40 CFR § 1508.27(b)(7)).

scheduled service at the Airport by amending 'Operations Specifications' ('OpsSpecs') in 2012," and (2) the FAA failed to "provide information about the impact of noise or air emissions that would be useful to the public." Pet'r's Br. at 43, 41. Also, they argue that the FAA segmented review of the new terminal from "other various projects that FAA requires for an airport with a high volume of A320 traffic."[16] *Id.* at 54. They contend that similar actions collectively expanding the Airport should be considered as a single project due to economic interdependence, common timing, and geographic proximity.[17]

---

[16] In 2017, Frontier switched from the Airbus A319 aircraft, which seats 156 to 162 passengers, to the more cost-efficient Airbus A320 aircraft, which can seat up to 186 passengers.

[17] The CEQ's implementing regulations for NEPA state: "Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3). Still, the NEPA regulations define "connected actions" without any reference to geographic proximity or common timing. *See* 40 C.F.R. § 1508.25(a)(1) (defining connected actions as actions that "automatically trigger other actions," cannot proceed without other actions, or are "interdependent parts

29

This Court rejects Petitioners' argument regarding economic interdependence, common timing, and geographic proximity. We adhere to the independent utility test when determining whether an agency has violated NEPA by allegedly segmenting its analysis. *Twp. of Bordentown*, 903 F.3d at 249; *see also Morongo Band of Mission Indians*, 161 F.3d at 579-80 (rejecting the petitioners' argument that "the FAA improperly segmented the [East Arrival Enhancement Project] from a larger project, the [Los Angeles International Airport] Expansion Project," because "the primary purpose of the [East Arrival Enhancement Project] was to deal with *existing* problems of delay and inefficiency"); *Lowman v. FAA*, 83 F.4th 1345, 1359 (11th Cir. 2023). In addition, as discussed above, Petitioners cannot pursue a late challenge to the 2012 action here. *See Lowman*, 83 F.4th at 1360. The sole action at issue before us is the FAA's 2022 approval of the layout plan modification for the new terminal.

The FAA considered actions that "have been implemented, are under current planning, or are

of a larger action"). And Petitioners fail to specify the projects to which they are referring, instead referencing "[t]he multiplicity of projects undertaken by the FAA and the County since 2013 after FAA's amendment to Frontier's OpsSpecs . . . ." Pet'r's Br. at 57.

anticipated in the near future." AR253. The past actions the FAA considered when assessing cumulative impacts included the following: rehabilitating runways; reconstructing taxiways; constructing a remote parking lot; redeveloping the Former Naval Air Warfare Center (therein demolishing existing buildings and building a hangar); removing trees that protruded into protected airspace; and demolishing a civil air patrol building.[18] The FAA also considered foreseeable future projects, including the following: rehabilitating and extending taxiways; building a combined snow removal equipment storage and maintenance facility; constructing a replacement air traffic control tower; constructing a deicing containment facility; and demolishing the existing electrical facility and building a replacement. Thus, as required under FAA rules for an EA's cumulative analysis, the Final EA's Affected Environment section "include[d] critical background information of past, present, and

---

[18] In considering the reconstruction of taxiways, the FAA took into account the reconstruction of Taxiways H and B, which started in 2015; the removal of trees that became obstructions in taxiways; and the reconstruction of Taxiways A and B, projects that began in 2021 and were set to finish in 2024.

31

reasonably foreseeable future actions." FAA Order 5050.4B, ¶ 706(e)(1).[19]

The FAA determined that the new terminal's impacts, even when combined with the other projects' impacts, would not be significant. Instead, the agency found that the new terminal's impacts would be temporary, since they related to the construction as it would take place on Airport property. Though Petitioners claim this conclusion fails to include "the area in which the effects of the proposed project will be felt, the impacts expected from the proposed projects, and the impacts from past projects," Pet'r's Br. at 41, the FAA did not need to expand the scope of the affected environment beyond the Airport. After all, as discussed above, the FAA reasonably concluded that the new terminal itself would not increase air traffic and thus would not cause more plane-related noise or air pollution. *See Twp. of Bordentown*, 903 F.3d at 254 (explaining that the NEPA cumulative impacts requirement "need only review impacts likely to occur in the area affected by the project under [the given agency's] review") (citing *Sierra Club v. FERC*, 827 F.3d 36, 50 (D.C. Cir. 2016)).

---

[19] *See also* 40 C.F.R. § 1508.27(a) (requiring that "the significance of an action[] be analyzed in several contexts such as . . . the affected region . . . and the locality.").

Plainly, creating a new terminal for the Trenton Airport has independent utility for multiple reasons.[20] The current terminal fails to meet ADA, TSA, and fire egress requirements. The current terminal lacks sufficient square footage for adequate restrooms, waiting areas, and security screening. The physical building's main structure is

---

[20] Petitioners try to shoehorn in an argument that the new terminal would be unnecessary if Frontier Airlines were not operating at the Airport, saying that the Project lacks independent utility for that reason. If this is a challenge to the FAA's 2012 decision to allow Frontier's operating specifications to be amended, such a challenge cannot be brought, for reasons we have already stated. The Airport proposed the new terminal in 2018, six years after Petitioners explain that the Airport's OpsSpecs' amendment allowed for Frontier to begin service there. Thus, the FAA could not have known in 2012 what the Airport would need in 2018. Requiring an agency to "analyz[e] possible future actions . . . that are far from certain would result in a gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful environmental analysis . . . ." *Soc'y Hill Towers Owners' Ass'n*, 210 F.3d at 181 (in the EIS context) (quoting *Airport Neighbors All., Inc. v. United States*, 90 F.3d 426, 431 (10th Cir. 1996) (internal quotation marks and citation omitted)).

noticeably aging, with some features in disrepair. With passenger trips forecast to increase in the future, passenger experience and service level provided will continue to decline unless a new terminal is built. As addressed in the AMPU, taxiway improvements will address existing safety and maintenance concerns.

The EA also noted the independent utility of the various projects occurring at the Airport.[21] For example,

---

[21] The EA states:

> As shown in Table 5-12 and above, TTN has completed or has proposed a number of improvements to the airport. Notably, the current MPU, recommended a robust multi-phase program of taxiway improvements needed to address safety and maintenance concerns. Collectively, these projects will assure that pavements are maintained in good condition, provide standard runway/taxiway separations, and improve safety of aircraft movements by reducing the number of runway crossings required for aircraft moving around the airfield. All of the listed projects are unrelated to the Proposed Action, and each has its own independent utility and is justified regardless of whether the

34

taxiway improvements will address existing safety and maintenance concerns. Further, they will address failing infrastructure, including issues with pavement and lighting. Certain taxiways need to have their 'non-standard' geometry corrected for safety reasons, and the Airport needs parallel taxiways for each of its runways. Taxiway improvements will reduce how often aircraft need to cross runways and provide more separation between runways and taxiways. Thus, the taxiway improvement efforts have independent utility.

The "FAA has discretion to determine whether, and to what extent, information about the specific nature, design, or present impacts of a past action are useful for the analysis of the impacts of the proposed action and alternative(s)." *City of N. Miami v. FAA*, 47 F.4th at 1271 (quoting FAA 1050.1F Desk Reference (V2), at 15-1 (Feb. 2020))." Here, for the reasons outlined above, "[w]e cannot say the FAA's exercise of that discretion was arbitrary or capricious." *Id.* Petitioners' cumulative impacts/segmentation arguments therefore fail.

---

Proposed Action proceeds. As shown, the projects are primarily maintenance and safety improvements. Several would benefit General Aviation users of TTN.

AR258.

### d. THE FAA DID NOT VIOLATE NEPA BY FAILING TO PROPERLY CONDUCT AN ENVIRONMENTAL JUSTICE ANALYSIS

A 1994 Executive Order requires federal agencies, "[t]o the greatest extent practicable and permitted by law," to "make achieving environmental justice [("EJ")] part of [their] mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations." Exec. Order 12,898 § 1-101, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (Feb. 11, 1994).[22] This means the agency must "consider designs or alternatives that will avoid or minimize 'disproportionately high and adverse' impacts on low-income communities or communities of color ('EJ communities')." *NAACP Erie Unit 2262 v. Fed. Hwy. Admin.*, 2022 WL 17986772, at *9 (W.D. Pa. Dec. 29,

---

[22] The Final EA recognized: "In accordance with EO 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, federal agencies are required to incorporate environmental justice into their planning processes." AR176.

2022).[23] The Order does not create a private right to judicial review. Exec. Order 12,898 § 6-609. Nonetheless, we conclude, as our sister circuits have in similar contexts, that "[t]he FAA exercised its discretion to include the environmental justice analysis in its NEPA evaluation, and that analysis therefore is properly subject to 'arbitrary and capricious' review under the APA." *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004); *see also Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006).

Here, the FAA conducted a reasonable EJ analysis.[24] The FAA focused its EJ analysis on the communities surrounding the Airport, since the proposed

---

[23] The Presidential Memorandum that accompanied EO 12,898 stresses the importance of promoting environmental justice through the NEPA review processes. Memorandum from President William J. Clinton on Environmental Justice to the Heads of All Departments and Agencies (Feb. 11, 1994).

[24] Petitioners cite scientific evidence in their reply brief to support their argument that the FAA chose an arbitrary radius to establish the location of EJ communities "simply because there were no EJ communities within that radius." Reply Br. at 35. As that evidence is not part of the administrative record, we need not and will not consider it.

project "would take place on existing Airport property," and "impacts to environmental resources . . . are primarily concentrated on Airport property and would be mitigated as discussed, and therefore, are not anticipated to impact [EJ] populations." AR230. One sister circuit has determined that conducting an analysis in a manner with such geographical limitations is reasonable because "significant noise impacts [were] limited to the vicinity of the airport." *See Cmtys. Against Runway Expansion, Inc.*, 355 F.3d at 689. We believe the same approach applies here.

Petitioners argue also that the FAA should have used data from census blocks, i.e., the smaller subdivisions within census tracts, instead of census tract data. The FAA's decision to use census tract data, corroborated by the EPA's modeling tool, was reasonable. *See Sierra Club*, 867 F.3d at 1368, 1370. The CEQ's guidance document instructing how to conduct an EJ analysis explains that minority populations "should be identified" where "the minority population of the affected area exceeds 50 percent" or "the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis." Council on Environmental Quality, *Environmental Justice: Guidance Under the National Environmental Policy Act*, 25 (Dec.

1997).[25] Moreover, the FAA noted that the size of the minority population and the population below the poverty level percentages were not meaningfully greater than the examined township, county, and state comparison populations.[26] Thus, contrary to Petitioners' assertion, the FAA "*did* recognize the existence and demographics of the [community] in question." *See Sierra Club*, 867 F.3d at 1370.

The FAA's use of the EPA's Environmental Justice Screening and Mapping Tool supports the reasonableness of the EJ analysis. The Final EA reported that, based on the Screening and Mapping Tool, "low income and minority populations are generally located southeast of the Airport and in Trenton, approximately over a mile to two miles from the project area." AR177. Moreover, the Tool showed that "the project area has a 20% minority population and a 10% low-income population,"

---

[25] FAA 1050.1F Desk Reference cites this guidance document when defining minority, low-income, and other EJ concepts.

[26] The minority percentage in the Airport's census tract was 33.2 percent, with 7.9 percent of the population living below the poverty level. These percentages are below the 50 percent threshold that the FAA uses to identify communities which preempt EJ concerns. *See Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 84 (D.D.C.), *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000).

39

percentages that are below the averages of both New Jersey (30% and 27%) and the United States (38% and 12%). AR177. We conclude from the foregoing that the FAA reasonably incorporated environmental justice into its planning process.

### e. THE FAA DID NOT VIOLATE NEPA BY FAILING TO PERFORM A HEALTH RISK ASSESSMENT AS PART OF ITS ENVIRONMENTAL ASSESSMENT

Petitioners contend that the FAA's decision not to perform a health risk assessment violated NEPA. A broad policy objective underlying NEPA is to "stimulate the health and welfare of man." *Morris Cnty. Tr. for Historic Pres.*, 714 F.2d at 274 (quoting 42 U.S.C. § 4321); *see also Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 106-07 (1983) ("NEPA requires an EIS to disclose the significant health, socioeconomic and cumulative consequences of the environmental impact of a proposed action.") (internal citations omitted); 40 CFR §§ 1508.7, 1508.8. Still, the Supreme Court has explained that "NEPA does not require the agency to assess *every* impact or effect of its proposed action, [] only the impact or effect on the environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 771-72 (1983); *see also N.J. Dep't of Env't Prot. v. U.S. Nuclear Regul. Comm'n*, 561 F.3d 132, 137 (3d Cir. 2009). Instead, agencies and reviewing courts "must look at the relationship between that effect and the change in the physical environment caused by the major federal

action at issue." *Metro. Edison Co.*, 460 U.S. at 773. For NEPA to apply, there must be a "reasonably close causal relationship between a change in physical environment and the effect at issue." *Id.* at 774.

Here, the FAA found no such relationship between any likely change in environment and the health of children in the surrounding communities "because the impacts to environmental resources are primarily concentrated on Airport property and will be mitigated."[27]

---

[27] In its response to comments, the FAA explained that a health risk assessment was not called for, and it further elaborated in the Final EA that:

> [n]o changes are expected between pre-development and post-development conditions, regarding health and safety risks. The proposed alternatives have been evaluated for their potential to have a disproportionate effect on children's environmental health or safety, including, but not limited to, water quality, air quality, and noise . . . . It has been concluded that the Proposed Action is not of the nature or magnitude to have an adverse effect upon the health and safety of children. Mitigation is not proposed.

AR231.

AR21. The FAA acted reasonably in deciding not to conduct a health risk assessment, as it considered the data needed "to make an informed decision that adequately took account of the important environmental concerns." *Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985). The FAA also coordinated with the New Jersey Department of Environmental Protection to ensure extensive plans were in place to handle any potential hazardous materials that terminal construction could disturb.

## VII.   CONCLUSION

The FAA's FONSI was reasonable; the FAA considered the cumulative impact of its past actions; it correctly concluded that no unlawful segmentation occurred; its EJ analysis met NEPA requirements; and NEPA did not require that a health risk assessment be made. Accordingly, we will deny the Petition.